## MODE OF CONTESTING AN ELECTION UNDER THE BEAL LAW — ANNEXATION PROCEEDINGS.

[Probate Court of Cuyahoga County].

ANDREW ROST V. THE VILLAGE OF GLENVILLE.

Decided, May 2, 1903.

*The Beal Law—Mode of Contesting Election Under—Annexation of Part of Village to a City—Regularity of Proceedings for—Section 1615—Apportionmen of Existing Indebtedness—When Annexation Proceedings are Perfected—Ratification of.*

1. Whether the mode of contesting the election in a municipal corporation in Ohio, under the Beal Law, so-called (95 Ohio Laws, 87), is so indefinite, uncertain and ambiguous as to render Section 4364-20*i* of said act invalid and void—*quaere?*
2. Section 1615 of the Revised Statutes of Ohio, providing for the annexation of part of the territory of a village to a city, where the same adjoin each other, as to the regularity and validity of the proceedings before the county commissioners, must be construed together with the provisions of the statute, Div. 2, Tit. XII, prescribing the manner of proceeding on applications to annex adjacent, unincorporated territory to villages and cities. The provisions of the statute prescribing the mode of altering the boundaries of municipalities by the annexation of territory, by reference and analogy, control the action of the county commissioners in exercising authority-under Section 1615, and these several statutory provisions must be construed together.
3. By the proper construction-and meaning of Section 1615, the action and proceedings of the county commissioners in ascertaining and apportioning the amount of the existing indebtedness of the village, in the manner prescribed in the last clause of said section, which is to be assumed and paid by the city, is an essential and constituent part of the proceedings for annexation.
4. After such apportionment is made, and the transcript of the proceedings and maps before the county commissioners are filed with the city clerk of the city to which such territory is sought to be annexed, the detachment of the territory from the village, and its legal annexation to the city, is not perfected and complete until the city, by the corporate action of its council, by ordinance or resolution, has accepted such territory, and assumed the indebtedness of the village so apportioned, together with all other municipal burdens and obligations with which the city is charged, with respect to its original territory.
5. The original application and action of the council of the city for such annexation, can not be construed as a sufficient ratification and assumption of such burden on the part of the city.

WHITE, J.

This case was heard on a demurrer to a petition and amendment to petition, contesting the election under the Beal Law, so-called, 95 Ohio Laws, 87.

Judicial action has been so frequently invoked in this county, to decide the validity of the election under the Beal Law (95 Ohio Laws, 87), held in the village of Glenville on the 25th day of February, A. D. 1903, that it is somewhat perplexing for the probate judge to dispose of the matters now pending in this court on the demurrer to the petition and amendment in this action. Temporary restraining orders have been granted by the common pleas, and then vacated, and one or more actions are now pending in the common pleas, involving the same questions embraced in the matters here; and furthermore, there is an error proceeding pending in the Circuit Court of the Eighth Judicial Circuit, which may, or may not, involve the merits of the contention between the parties in this action.

It had been my purpose, until recently, to defer the disposition of this demurrer until one of these superior courts had decided the matter.

Not long since, the election of the Mayor of Glenville was contested before this court, in which the question of the charter election for municipal officers in the village of Glenville, on the 6th day of April, 1903, was involved. The contention by the contestor in this recent case of *Bach* v. *Goff, Mayor,* was that a part of the former territory of Glenville had been detached, and annexed to the city of Cleveland, before the municipal election, and if the votes cast in said disputed territory had been thrown out, C. C. Shellentrager, who was the opposing candidate of F. H. Goff, would have been elected, and not Mr. Goff. The precise ground of controversy was involved in the contest of the municipal election, that is taken and covered by the contest of the Beal Law election. The unique procedure adopted in construing the law applicable to the contest of the municipal election, devolved the question of both law and fact upon three freeholders who were called in as jurors or referees, to assist the probate court in the case of *Bach* v. *Goff.* The decision of the freeholders was that the election of F. H. Goff, as Mayor, was valid and regular, thereby deciding that the territory formerly known as the Second Ward, was not detached from the

village of Glenville, and annexed to the city of Cleveland at the date of the election, which was April 6, 1903.

It must be said, however, that this decision ought not to be treated as conclusive in the determination of this demurrer. If it should be found that the votes cast in this disputed territory in Glenville in the municipal election on the 6th of April last, should be thrown out as illegal votes for the municipal officers of Glenville, it being conceded that the city of Cleveland had failed to set up any election machinery in said disputed territory, it would necessarily have resulted in disfranchising a large number of the intelligent community of Glenville. How much this consideration had to do with the decision of the freeholders in the recent case, the court is not in a position to know, but it must be presumed that this situation reasonably and properly had some weight to influence the decision in the case. This point in argument, as submitted to the jury in this case, was not urged, but the whole contention pivoted upon the validity of the annexation proceedings, which have become familiar history in the courts in this county.

I have called attention to this judicial history for the purpose of suggesting that it may seem presumptious in the court to attempt to dispose of the matters involved in this controversy at this time. No judgment that this court can render will be binding or conclusive, and it may, possibly, have become almost a matter of indifference what disposition is made of this demurrer.

A rational and sound decision of the matter presented in this demurrer necessitates a careful, broad and comprehensive examination and consideration of the statute law governing the relations of municipal corporations in the state of Ohio. Nothing is more uncertain at the present time, than municipal law generally in this, our glorious commonwealth. It may not, therefore, be out of place for the court to say that it has had the benefit and valuable aid of the industrious research, close and critical reasoning, and able argument of counsel on both sides of this case. It is rare indeed that causes have ever been presented to a court, in which all conceivable questions and related matters have been more thoroughly digested and discussed, than was exemplified upon the hearing of this demurrer. Counsel must not expect the probate judge to follow out, in all the intricate details, a collation and comparison of these statutory provisions, and to bring out a system-

atic methodical exposition of this somewhat confused legislation.

The line of battle is drawn upon the proper construction and interpretation of Section 1615 of the Revised Statutes of Ohio. Evidently the statutes, as regard the growth and development of municipal corporations in Ohio, have been evolutionary, until it became substantially impossible to sustain the protean forms into which municipal legislation had become crystalized, and the Supreme Court, by one stroke, recently uprooted the entire incongruous growth.

Before taking up the points so ably discussed, concerning the regularity of the proceedings of detachment and annexation of territory from one municipality to another, as provided in this section of the statute, a few general considerations may not be out of place.

The procedure for contesting an election in the probate court is embraced in Sections 572 to 578, inclusive. A mere superficial examination of these provisions of law, lead one to conclude at once that the provisions were originally designed to govern, exclusively, the election of a justice of the peace, and no other officer. The preceding section, 568, grants power to the probate judge, on proper application, petition and notice, to increase or decrease the number of justices of the peace in any township, and then follow these provisions for contesting the election of a justice of the peace. The language of the statute applies exclusively to the election of this township officer, and no other. The proceedings on determining the result of the election, are special and specific, and can not in any way be applied to the results of a contest as in this action. The whole proceeding for the contest of an election, under these statutes, is so divergent and apart from other contested elections, that it is remarkable that the Legislature has sought to make, by reference merely, these provisions applicable to the case of the contest of the election by the section of the so-called Beal Law, 4364-20i, but such seems to be the clear intent of the lawmakers in providing this section, the language of the section being as follows:

"Any person being a qualified elector in any municipal corporation wherein an election shall have been held, as provided for in this act, may contest the validity of such election by filing a petition, duly verified, with the probate court of the county in which such municipal corporation is situated.      *       *       *       *

"The probate judge shall have final jurisdiction to hear and determine the merits of the proceeding, and in other respects in the procedure of the hearing, he shall be governed by the law providing for the contesting of an election of a justice of the peace, *so far as such law is applicable.*"

When we remember that modes of contesting elections, which are special, and are made parts of specific acts of legislation, have been held to provide an exclusive and special remedy, prohibiting proceedings in quo warranto, mandamus, and all other modes of raising issues on elections, it is surprising and anomolous that the law makes these old provisions for contesting the election of a justice of the peace, do duty in so important a public matter as contesting an election where it is not a question of whether this or that individual has been elected to a petty office, but impeaching the validity of a referendum to a whole community, determined by the elective franchise.

The judicial power should be most guardedly and carefully exercised, where the procedure in applying the remedy is uncertain, vague, and obscure, as in the law of contest in this case.

> *State, ex rel Wetmore,* v. *Stewart,* 26 O. S., 216.
> *State, ex rel,* v. *Marlow,* 15 O. S., 114.

If the Legislature, to avoid repetition, has so far failed, by erroneous or uncertain references to other acts and laws which are manifestly incongruous and inapplicable as providing the proper procedure, to open a clear path of duty to the court, in a case of contested election where its decision is final, then the fault must rest with the legislative, and not with the judicial authority.

Now the mode of contesting an election under the Beal Law, shall be such as is prescribed "for the contest of the election of a justice of the peace, *so far as applicable.*" When we refer to that law, a doubt is at once raised whether the law is in any way applicable in very important particulars. The sum of what the court suggests on this point, is that where the power and process of its exercise are both doubtful, its judgment and action should be the sound result of strict construction, having the undoubted warrant of law.

The provisions of the statute, 95 O. L., 87, so far as the law attempts to afford the right of contesting the election, is very pe-

culiar. There is great force in the claim of learned counsel for contestor, that the effects of an election under this law are very grave and important. The vested rights of property may be jeopardized and destroyed, by a popular movement which may be based wholly upon prejudice, engendered by the distempered passions of men, inflamed by mistaken zeal and partisan sentiment, and not by the calm judgment and wise regard for the public good.

It is well settled judicial history, that in Kansas and other states, where extreme laws have been enacted, prohibiting the sale of intoxicating liquors, that this tide of destructive legislation has been stayed by that solid bulwark of constitutional law, which prohibits the taking of private property without due process of law. Virtually, it becomes a species of confiscation.

The operation of this law, under which, by a popular election, the largest rights of property may be destroyed, puts it within the power of any elector of the municipality, to challenge the election, and put in force the legal machinery to contest the election. To use the verbiage of the street, suppose the village had "voted wet," any elector, actuated by whatever whim or caprice, could set in motion the law to reverse the public action.

It is a sound proposition that the conditions of such a contest, and the manner and mode of procedure, should be clearly, positively, and unambiguously prescribed. It is far from being the case here. In this respect the act is indefinite, uncertain, if not fatally inconsistent. The action and judgment of the probate court, expressed through the administration of a few vague, ancient provisions of the statute, passed to control the contest of an inferior township officer, is made final. Taking the most favorable view that can be taken of the so-called "Beal Law," it is, in the judgment of the court, a very serious question whether that part of it which provides the procedure to contest the election, could stand, if called in question before a court of superior jurisdiction; or whether it is not so indefinite, uncertain and defective as to be invalid and unconstitutional.

Notwithstanding this uncertainty, and the conclusion justified by it, the court considers that this demurrer must be disposed of on its merits as submitted.

The election occurring in the village of Glenville under the local option law (95 O. L., p. 87) on February 25, 1903, is ad-

mitted to have been in all respects regular and valid, within the legal boundaries of the village. It is, in substance, contended by the contestor, that the vote of a part of the electors resident within the city of Cleveland were counted and added to the vote in the village, to make up the determinate results of the election. To maintain the contest on this proposition, it is conceded by the demurrent that the petition and amendment recites correctly the history of the proceedings before the County Commissioners of Cuyahoga County, and subsequently in the offices of the county recorder and clerk of the city. The contention of the village is that, conceding the truth of all these facts, the election of February 25, 1903, was not invalidated by counting the votes of any electors residing in the city of Cleveland. In other words, the territory originally embraced in the village of Glenville remained intact at that date. To render the election invalid, these admitted facts set forth in the petition and amendment must, by fair intendment and meaning in law, have worked the complete legal detachment of that part of the territory of Glenville, formerly called the Second Ward, and its legal annexation to the city of Cleveland. With perfect frankness the contestor assumes the burden of this proposition.

The election of February 25, 1903, was purely municipal and local; and if the electors dwelling on the territory in dispute were residents of the city of Cleveland, they will not be disfranchised, nor their rights and privileges as citizens abridged or affected by throwing out their votes. If they were residents of Cleveland, the residents of Glenville have no right to reap the supposed benefits of their votes in the general result. *What then, was the legal status of that territory formerly known as Ward 2 in the village of Glenville, in relation to the election of February 25, 1903?* The correct answer to this question must be decisive of the issue on the demurrer.

Whether an *obiter dictum* or not, it is a pertinent and wise remark of Judge Spear, in 50 O. S., 297, wherein he says: "The proceeding is purely statutory, and the question is therefore to be determined by a consideration of all the statutes bearing upon the subject. In arriving at a conclusion, the test to be observed, is the intent of the law-makers as expressed by the law."

The contestor argues with much plausible force, that the first proviso contained in Section 1615 of the Revised Statutes of Ohio, must be confined to, limit, and control the *action and duty of the county commissioners alone, in the proceedings of annexation of a part of* a village corporation, to a city.   The language is as follows:

"And such territory shall thereafter constitute a part of such city, *provided,* that in all their proceedings in the premises, the county commissioners shall, as far as the same are applicable, be governed by the provisions of this division prescribing the manner of proceeding on applications for the annexation of adjacent unincorporated territory to villages and cities."

It is insisted that this language by clear reference, confines the operation of the words, "so far as applicable" exclusively to the acts of doings of the commissioners; and renders wholly inapplicable those provisions of Sections 1589 to 1605, save and except as to the acts of this tribunal alone.   To judge of the soundness and value of this contention, the broader scope, purpose and intent of this, and related enactments, granting power to enlarge and change the boundaries of municipal corporations, must be carefully scrutinized, and kept steadily in view.

It will be found that in every case, where these changes and annexations are consummated by the concurrent action of two parties, either upon the original initiation of one or both, opportunity is afforded, if not invited, by the law, to invoke the intervention of judicial supervision by injunction, by any person whose rights may be affected.   To render this remedy adequate, time limit is fixed delaying the final consummation and completion of the annexation. This condition plainly exists in that body of legislation providing for the annexation of unincorporated territory.   It will be found also, that in several of these cases, the law, in express terms, fixes the time, in the course of the proceedings, when the annexation shall be considered consummate and complete.   Several of these declaratory provisions are collected by counsel for the contestor in their brief.

In the revision of our Statutes of 1880, Title 12, Div. 2, Chap. 5, provides for the annexation of unincorporated territory.   Section 1597 reads: "When the resolution or ordinance accepting such annexation has been adopted, the territory shall be deemed a part of the city or village, and the inhabitants residing thereon, shall have

all the rights and privileges of the inhabitants within the original limits of such city or village."

Again, it may be safely said that there must necessarily be two parties, first or last, in all these statutory schemes of annexation. It is said that by virtue of Section 1615, there *are* two parties, and that the proceedings of the commissioners are set in motion at their joint instance, and by their concurrent action. At least two-thirds of the inhabitants of the portion of the territory of the village, is one party; the city, acting through its council, is the other party. Again, in this general view of the operation of these statutes, it might be well to note the peculiar expression, and significant words, which imply, not only joint and concurrent action of the parties, but the operation of such action upon the territory involved.

The two words are "detached" and "annexed." All of these statutes keep these dual operations distinct. These two results must, in the final outworking of all these laws, however, concur in time and legal effect. It would be against the policy of the law to have the partial operation to "detach" the territory, and leave it, and its inhabitants suspended in a dubious state of abeyance, until by further action it can be "annexed." Indeed, such a state would be absurd, as well as impolitic. Most emphatically, until the *annexation* is consummate, the territory is in no sense *detached*.

There is another general observation to be made upon the attitude of the parties defined by Section 1615. Two things must concur to move the commissioners to act: the "application" of the council of the city; and "the written request of at least two-thirds of the legal voters inhabiting the territory proposed to be annexed." It should be remarked that there is no unanimity essential on the part of the citizens of the village, nor do they act through the instrumentality of any corporate organ. It seems to the court that this fact has some bearing upon the construction of Section 1615. If any of the silent one-third of the citizens of the territory should feel aggrieved by the action of the commissioners, what remedy have they, except by the statutory injunction provided by Section 1594 of Division 2, Title 12? None whatever. It seems a great lapse in legislative wisdom, if this is so, in view of the fact that, by the terms of the Beal Law, care is taken to afford any single citizen the right to contest the election.

Another general observation of the general features of these laws, is their uniformity in providing that the county commissioners shall be the tribunal to hear and determine the application for annexation, and alteration of municipal lines. It does not derogate from the importance and dignity of the office, to say that county commissioners are not usually learned in the law, nor very well qualified to exercise important judicial functions. In view of this fact, the law-makers have wisely opened the way for judicial supervision and scrutiny, by providing a short period of limitation to the final ripening of their proceedings, during which time this special statutory restraining order, and careful review of the proceedings, may be had in a court of competent jurisdiction. Something more—and different from—the remedy by injunction, which was once considered an emergent and extraordinary remedy, but now has become so familiar, is provided by these statutes. There is good reason for concluding that in the view of the Legislature, this was to provide a uniform and necessary mode of checking any hasty or ill-considered action.

The vital question is: When is the action of the commissioners by Section 1615 final, and when is the work of annexation complete?

Passing now to a closer analysis of the section, in the light of these general analogies and characteristics of this species of legislation, how stands the case?

The tendency of contestor's argument is to establish the proposition that the whole work of annexation is embraced in, and must be confined to, the exercise of the powers, rights, and duties, *prescribed in this section alone.*

There seem to have been intervals in the steps taken in the proceedings before the commissioners. On the 8th day of November, 1902, the order to detach the territory in question from the village of Glenville, and annex to the city of Cleveland, was made. On the 23rd day of December, 1902, following, a transcript of the proceedings and map were delivered to the county auditor. The day preceding, the records shows that a like transcript was delivered to the clerk of the city of Cleveland. The apportionment of the indebtedness of the village was not made by the county commissioners until the 21st day of February, 1903, and on the 24th day of February, the same was certified to the county recorder and city clerk.

It is stated by counsel in argument, that the question of the date of their completing the process of annexation may be in the alternative, either on the 8th of November, 1902, on the 23rd day of December, 1902, or at latest, on the 24th day of February, 1903.

There are very cogent reasons why there should not be any doubt or uncertainty about this point in their proceedings, and the time when the legal work of annexation was complete and consummate. In the opinion of the court, this admission by the contestor that the date of the consummation may be debatable, certainly does not strengthen his argument.

Great stress is laid upon the position and relation as to context in this statute, of the words following the recitation of the essential steps in the proceeding, to-wit: "And such territory shall *therafter* constitute a part of said city." It should be observed that this section, 1615, was amended in 1888; that the latter clause, beginning with the disjunctive word *"and* set off and apportion," etc., was added after, as one of these amendments. The first proviso, as well as the second, were parts of the original act.

It is one of the canons of statutory construction that clauses may be transposed to effectuate the manifest intent of the Legislature, as expressed in the whole enactment taken together.

The second proviso commencing with the words, "And provided further, that the commissioners shall ascertain," etc., "on the annexation of the territory aforesaid," must, according to all rules of interpretation be taken and held to be a necessary and constituent part of the proceedings of the commissioners, antedating the consummated annexation. The contestor does not disclaim this as being a proper conclusion. In the judgment of the court, it is a very important fact, bearing upon the question of the meaning of this law. One of the most important functions of the commissioners is this quasi judicial duty of apportionment of the account of the existing indebtedness of the village, which shall be assumed and paid by the city as an essential part of the process of annexation.

It is said that the city is bound, by the action of the commissioners, without subsequent ratification or approval, by submitting the application for the annexation in the first instance. It seems to me that this is erroneous. That the law-makers looked upon this matter of making this apportionment as important is evidenced by

the last amendment to the section which defines the manner of arriving at the proper apportionment.

Now it may be said that the representatives of the city have their day before the commissioners upon that subject, as well as others connected with the proceedings, but that does not satisfy the situation. The results of the action of the commissioners in this respect involve the powers to levy taxes by the city government. It would be placing in the hands of the county commissioners an enormous power to treat their action in the exercise of this most important function as being final and conclusive.

If the annexation is complete and final at the point of fixing this apportionment of the indebtedness, and returning the petition, proceedings and maps to the county recorder, then, without corporate action in assuming the obligation by the city, to pay the indebtedness of the village—the obligation imposed by all the sections of the statute, upon the city municipality, to keep the streets, alleys and public improvements in the annexed territory free from nuisance, open, and in repair; to be liable for all damages which might result to person or property by any negligent condition of these public improvements, and all these obligations, both as expressly and impliedly assumed, must have been the situation of the city in its relation to this annexation on the 24th day of February, 1903.

After great deliberation, and with the best light that I can obtain, I can not bring myself to believe that the city of Cleveland had, on the 25th day of February, 1903, by ordinance, resolution or proper corporate action, assumed the burden and responsibility imposed by the complete and final annexation of this territory to its borders.

I must be allowed to repeat, that it is very rare indeed, that the facts and law involved in a judicial contention, have been with such acumen, research, ability and force exemplified by counsel as in this case. My office in the disposition of this matter is merely superficial and tentative. Nothing that the probate court could do or say in the present attitude of the matter, would be at all final or conclusive.

I must make one further observation. In ably urging this case, counsel for the contestor very properly admonished the court to investigate this matter without prejudice, prepossession, or favor, and without being actuated by any of the social or moral senti-

ments which are supposed to be involved in the election of February 25th, 1903. I most candidly assure parties and counsel that the court has dealt with this matter as a pure, simple, legal proposition, disassociated from all considerations involved in the result of that election.

It follows from the considerations which I have so imperfectly expressed, that the demurrer to this petition and amended petition must be sustained.

*George B. Solders and P. H. Kaiser,* for the contestor.

*Clifford Neff and C. M. White,* for the village of Glenville.